FILED

2011 Oct-20  PM 01:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN  DIVISION

| | | |
|---|---|---|
| **MICHELE W. ALLDREDGE** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-10-BE-1778-E** |
| **TALLADEGA COUNTY BOARD OF** | ] | |
| **EDUCATION,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |

### MEMORANDUM OPINION

This Section 1983 case, asserting retaliation resulting from protected speech, is before the court on Talladega County Board of Education's "Motion for Summary Judgment" (doc. 15). For the reasons stated in this Memorandum Opinion, the court finds that the motion is due to be GRANTED as to the federal claim.  The court DOES NOT REACH the motion as to the state claims.

### FACTS

At the beginning of the 2006-07 school year, the Defendant, the Talladega County Board of Education, hired the Plaintiff, Michele Alldredge, in an LPN position based at Mumford Elementary School but also covering Munford High School and Middle School.  This hiring occurred during the tenure of Dr. Suzanne Lacey as Coordinator of Personnel and Human Resources for the Board. Alldredge was in fact an RN.  Alldredge's supervisor, principal Rebecca Robinson, and the assistant principal, Brooke Morgan, both gave Alldredge the highest

rating of "1" on her evaluations, signifying excellence.

Around 2007, the legislature enacted a law implementing a salary matrix for RNs requiring that all RNs be paid according to the RN matrix whether the nurse held an RN or an LPN position.   At Alldredge's request, the Board eventually agreed to pay her according to the RN salary matrix.  At some point, the Board hired an LPN who worked as a school nurse based at Munford High School and also covered Munford Middle School, and Alldredge became the supervising nurse for that LPN position.

On July 1, 2008, Dr. Lacey was named Superintendent for the Talladega County Board of Education.  In the fall of 2008, the Board hired Hydi Champion to work in the LPN position based at Mumford High School under Alldredge's supervision.  Before the Board hires new nursing staff, it generally consults with the systems supervising nurse, Laurie Lewis; however, Lewis was out on medical leave at the time the Board hired Champion, and the Board did not consult her about this personnel decision.  When Champion called Alldredge to advise her that she had been hired for  the LPN position and would start the following week, Alldredge learned that Champion did not know about insulin-to-carb ratios necessary to care for her diabetic students.  Further, Alldredge discovered that Champion was not aware that she had one student who would likely require the administration of Diastat, a medication to control seizures, and was not familiar with Diastat.  Both of the LPNs that Alldredge had previously supervised knew about insulin-to-carb ratios and how to handle students prone to seizures.

After this conversation with Champion, Alldredge contacted Kelvin Cunningham, the supervisor of nurse Lewis as the Board's coordinator of student services, and informed him of her concerns about Champion's ability to perform her position. Cunningham indicated that he

would relay her concerns to Dr. Lacey.  Alldredge contacted Cunningham because nurse Lewis was on leave, and the issue involved nursing duties.  Alldredge also contacted Sherry Marbury, the Alabama Department of Education school nursing superintendent, and "asked if there was a policy for orienting new employees and what [Alldredge's] responsibility as a supervising nurse would be if [she] knew that someone had been hired that did not have the knowledge or skills to safely take care of the children that were placed within [her] care." (Doc. 17-9, at 11, sub-page 41, lines 15-22). Marbury referred her to Carolyn Morgan at the State Board of Nursing, to make sure that all interested parties were aware of the situation. Alldredge spoke to Morgan about Champion's perceived incompetency and Alldredge's communications suggesting a plan of action involving orientation.

At the instruction of either Morgan or Marbury, Alldredge wrote a formal letter to Cunningham, dated September 15, 2008, documenting her concerns and proposing a plan of action, such as an orientation to train Champion.  That letter read:

> I am writing in reference to our telephone conversation this morning concerning the LPN position at Munford High School.  As I stated this morning, Mrs. Champion stated to me Friday that she was unaware that the position required her to care for four diabetics and a student with seizures who is prescribed Diastat.  She also does not have experience in calculating carb values.  As these skills are integral in the management of the students to which she is assigned and the position is very independent in nature, I feel that it is not in the best interest of the students of MMS and MHS to have her in this position without an extensive orientation to the position and the knowledge and skills necessary to be legally competent in her position.
>
> I have spoken with Sherry Marbury, school nurse consultant with the Alabama Department of Education. . . A nurse placed in any situation that she does not have previous experience and limited knowledge must have an extensive orientation in which she is closely supervised.  As you and I discussed this morning, the nursing obligations which I have at Munford Elementary prohibits [sic] the scope of orientation and supervision of Mrs.

3

>Champion during the management of the diabetic students at MMS and MHS
>as they occur at the same time of the school day, and I am able to spend only
>limited amounts of time at MMS and MHS each day.
>
>Similar situations have occurred in the past when substitute nurses have
>worked within the schools who do not have the level of competency required
>to manage the diabetic students within our schools. . . .
>
>In an effort to address the current situation at MMS/MHS and help prevent
>similar situations in the future, the Talladega County Board of Education
>needs to implement a detailed orientation program for all new hires and
>substitutes.  By allowing the new hires and substitutes to work closely with
>the current school nurses, the competency and skills required to safely
>manage the students we are entrusted to care for can be ensured.

(Doc. 20-6, at 1).

Alldredge delivered the letter via email and also by hand to Cunningham, who informed

Alldredge that he would discuss the matter with Dr. Lacey, and he did indeed do so.  He also

advised Dr. Lacey that Alldredge had contacted Marbury.  Cunningham did not present

Alldredge's concerns as a complaint nor did Dr. Lacey consider them to be so.  Alldredge never

made any statements at a public forum or to the community at large about her concerns regarding

Champion nor did she speak about them directly with Dr. Lacey or any other Board members.

Champion subsequently started work, and one report shows September 16, 2008 as her

employment date.  At the time Champion began work, Alldredge had heard nothing further from

the Board about Champion's eligibility for her job or Alldredge's concerns on that issue.

Therefore, Alldredge wrote out instructions for Champion regarding insulin-to-carb dosages and

worked out a system with Champion where Champion would call Alldredge if she needed help in

this area.  When Champion began work, Alldredge advised her of the contact with Marbury

regarding Champion's lack of skills and knowledge and advised Champion to inform Ms. Jones, her supervisor at the Board, of that deficiency.

During Fiscal Years 2009, 2010, and 2011, the State of Alabama declared proration, which reduces the funds all state and local governmental entities receive from the state. In Fiscal Year 2009 ending September 2009, the state prorated the Board's budget 11%; 9.5% in Fiscal Year 2010 ending September 2010; and 3% in Fiscal Year 2011 ending September of 2011.  In early 2009[1], having learned that the Governor planned to declare proration at some point in the Spring of 2009, Dr. Lacey met with the following people to develop a plan to reduce Board expenditures:   Personnel Director Cunningham, Special Education Services Coordinator Gayle Jones, and the Chief School Financial Officer for the Talladega County Schools Avery Embry. The Board receives money from federal, state and local governments derived from revenues that those entities receive, and thus, the amount the Board receives varies from year to year.  The amount of funds does not necessarily determine the number of personnel positions, such as nursing positions, that the Board hires or retains; the Board officials have the discretion, given their budget and certain restrictions, to make the determination about the number and nature of personnel positions.

As part of the cost-reduction plan, the group made the following adjustments and

---

[1] The court notes that paragraph 13 of  Dr. Lacey's affidavit states that she learned about proration in early *2008,* but that paragraph and the next one refer to other events that would only make sense if she learned of proration in early 2009.  Defendant's undisputed facts in its brief (Doc. 16, ¶ 22) refer to paragraph 13 of Lacey's affidavit and use similar language but change the date to 2009.  Because Alldredge does not dispute, and thus admits, the facts in paragraph 22, and because substituting 2009 for 2008 when reading paragraph 22 of the affidavit in context makes logical sense, the court must assume that this date was a typographical error in the affidavit.

changes: (a) eliminated one RN position; (b) eliminated one LPN position; (c) eliminated three positions in the Child Nutrition Program; (d) did not fill a Deputy Superintendent position; and (e) reduced the amount of expenditures for art and science supplies.  Alldredge disputes the fact that the Board eliminated one RN position in the Spring of 2009 for the next year and points to Lacey's deposition testimony that shows approval for four RNs and two LPNs for Fiscal Year 2008 and Fiscal Year 2009.   The court points out that Fiscal Year 2008 ends September of 2008 and Fiscal Year 2009 ends September of 2009.  The first school year after the alleged elimination of a nursing position would be school year 2009-10 corresponding with the Fiscal Year 2010 ending September of 2010.  Thus, Fiscal Year 2010 would have been the year that would have reflected a decrease in the number of nursing positions from four to three, not Fiscal Year 2009, and Fiscal Year 2010 does indeed show such a decrease in the RN positions.  (Doc. 17-1, at 12). Therefore, the "dispute" over the number of approved nurses for the 2009-2010 school year in Fiscal Year 2010 is not a *genuine* one.   At some point during or after the cost-reduction determination process, Embry prepared a document entitled "Budget Reduction FY 09" that reflected additional proposed changes to the budget.

 Alldredge was the last RN hired, and the Board did not renew her employment in the Spring of 2009 for the 2009-10 school year.  Dr. Lacey, who made the decision, acknowledged that Alldredge was a good nurse and that the budget reduction was the single reason for the decision. Alldredge received the news in May of 2009.  In accordance with its cost-reduction plan, the Board also did not renew the employment of one LPN.  Further, the Board did not renew the employment of several other employees throughout the system.

After the elimination of one nurse position, the Board realigned nursing duties so that RN

Carolyn Washington covered all three Munford schools; Washington had additional nursing duties as a result of the re-alignment.  Washington had never complained about being paid according to the wrong schedule or about matters of public concern.

### STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats &*

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)  Substantive law determines which facts are material and which are irrelevant. *Id.* at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## DISCUSSION

The Complaint in this case contains three counts, two counts brought under Alabama law and a third federal claim.  Specifically, the only federal count, Count Two, asserts a civil rights violation under 28 U.S.C. § 1983 for termination of Alldredge's employment under color of state law in retaliation for the exercise of her First Amendment rights to free speech.  Defendant argues among other things that her speech is not protected by the First Amendment, because it did not involve a matter of public concern.

"[A] public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech."  *Cook v. Gwinnett County School District*, 414 F.3d 1313, 1318 (11th Cir. 2005).  However, an public employee's right to free speech is not absolute but must be balanced against the "[s]tate's interest as an employer in regulating the speech of its employees [which] differ[s] significantly from those it possesses in connection with regulation of

the speech of the citizenry in general." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (internal

quotation omitted). "Acting as an employer, the government is afforded broad discretion in its

employment decisions." *Boyce v. Andrew*, 510 F.3d 1333, 1341-2 (11th Cir. 2007).   Therefore,

"to strike the appropriate balance between the respective interests, [courts have applied] the four-

step analysis set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L.

Ed. 2d 811 (1968) and *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989)." *Cook*, 414

F.3d at 1318.   Under that analysis,

> an employee must show that  (1) the speech involved a matter of public concern;
> (2) the employee's free speech interests outweighed the employer's interest in
> effective and efficient fulfillment of its responsibilities; and (3) the speech played
> a substantial part in the adverse employment action. . . . If an employee satisfies
> her burden on the first three steps, the burden then shifts to the employer to show
> by a preponderance of the evidence that it would have made the same decision
> even in the absence of the protected speech. . . . The first two steps are questions
> of law; the final two steps are questions of fact designed to determine whether
> the alleged adverse employment action was in retaliation for the protected
> speech.

*Id.*  (internal citations and quotations omitted).

In the 2006 case of *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006), the

Supreme Court "clarified and simplified" this analysis in a significant way.  *See Boyce v.

Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (using the quoted language in its explanation of

*Garcetti*'s effect on First Amendment inquiries regarding the speech of public employees).   In

*Garcetti*, the Supreme Court addressed whether First Amendment protection attached to two

disposition memoranda that a deputy district attorney wrote recommending dismissal of charges

in a case based upon a search warrant that he felt contained misrepresentations.  A meeting to

discuss his recommendations with supervisors and employees of the sheriff's department became

heated, and despite his concerns about the search warrant, the prosecution of the case proceeded. At trial, the defense called the deputy district attorney to testify about the alleged misrepresentations in the search warrant, and although the trial judge ultimately rejected the challenge to the search warrant, the deputy district attorney was subsequently transferred to a less favorable deputy position at another courthouse.  He sued under Section 1983, alleging that his job change represented retaliation for protected speech.  In determining whether his speech was protected, the Court considered the "controlling factor" to be whether his speech was performed pursuant to his job duties, identifying as relevant the factors of whether the speech occurred in the workplace and whether the speech concerned the subject matter of the employee's job.  547 U.S. at  420-21.  The Court determined that his memoranda were not protected speech because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id*. at 421.  The Court proceeded to explain, "When a public employee speaks pursuant to employment responsibilities, ... there is no relevant analogue to speech by citizens who are not government employees."  *Id.* at 424.

Following *Garcetti*, the Eleventh Circuit "has modified the analysis of the first step of the *Pickering* test for analyzing alleged government employer retaliation to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." *Boyce*, 510 F.3d at 1342 (citing *D'Angelo v. School Bd. of Polk County, Fla.*, 497 F.3d 1203, 1209 (11th Cir. 2007)). To receive First Amendment protection, government employees must speak *both* on a matter of

public concern *and* as a citizen as opposed to an employee.

The court will first consider the threshold question of whether Alldredge has met the first step of the analysis as modified by *Garcetti*, a question of law for the court to decide.  The court must analyze the "content, form, and context" of a plaintiff's speech to determine its nature. *Connick v. Myers*, 461 U.S. 138, 147 (1983).  In analyzing whether Alldredge's speech is protected by the First Amendment, the court does not consider Alldredge's complaints regarding her proper pay; she acknowledged in her responsive brief that those complaints are not protected. Rather, the court focuses on Alldredge's speech relating to nurse Champion's lack of competency and how the Board should resolve the problem.

The court first addresses Alldredge's communications with Cunningham, because he relayed those communications to Dr. Lacey, the person who ultimately made the decision not to renew Alldredge's employment.  As to the content of those communications, Alldredge questioned the competency of Champion, a nurse under Alldredge's own supervision, to handle the health needs of students at Mumford's upper schools suffering from diabetes and seizure disorders; Champion did not have experience in calculating carb values for the diabetics or in administering Diastat to combat seizures. In addition to questioning Champion's competency, Alldredge's letter to Cunningham also advised him that she had communicated her concerns to Marbury, the Alabama Department of Education's school nurse consultant.  Further, Alldredge proposed a plan of action – extensive orientation with close supervision –  to avoid such problems, not only with new hires, such as Champion, but also with substitute nurses because "[s]imilar situations have occurred in the past with substitute nurses."  (Doc. 20-6, at 1). However, Alldredge explained that she herself could not provide the proposed orientation in

Champion's case, because her own nursing duties at Munford Elementary prohibited her ability to provide it.

As to the form of Alldredge's speech, it involved private conversations with three individuals: two phone calls and one letter to Cunningham, as well as phone conversations with Marbury at the Department of Education, and Morgan at the nursing board. Cunningham acknowledged that he relayed the information he received to Dr. Lacey, the person who would ultimately make the decision not to renew Alldredge's employment.

The context of Alldredge's speech involved no public forum and no attempt to contact the public at large. Alldredge's communications were limited to a supervisor in her school system who handled nursing matters and people in the nursing community who could provide her with guidance on her responsibilities as a school nurse and supervising nurse. In her letter to Cunningham, Alldredge did state that she was raising these concerns *on behalf of* the Mumford students: "it is not in the best interest of the students [of the middle school and high school to which the nurse was assigned] to have her in this position without an extensive orientation to the position and the knowledge and skills necessary to be legally competent in her position." However, mid-way through her letter, Alldredge also discussed the competency problem as it related to Alldredge's *own* work duties to supervise Champion: "the nursing obligations which I have at Munford Elementary prohibits [sic] the scope of orientation and supervision of Mrs. Champion during the management of the diabetic students at MMS and MHS as they occur at the same time of the school day, and I am able to spend only limited amounts of time at MMS and MHS each day." Alldredge does make a reference to similar situations occurring in the past involving substitute nurses at "the schools," without specifying whether she was referring only to

13

the Mumford Schools under her general supervision.  She then ended the letter by suggesting a

plan for orientation of newly hired school nurses and substitute nurses. (Doc. 20-6, at 1).

As noted, Alldredge also communicated orally through telephone calls both with Marbury

at the state Department of Education and Morgan at the state Board of Nursing, but no evidence

exists that these people had any input into her employment decisions.  However, the court

addresses these communications, because they remain relevant for several purposes.  First, they

provide context for the Cunningham communications and assist the court in determining whether

Alldredge spoke as a citizen or employee and spoke within or without the confines of her

employer's mission. Further, Cunningham and Dr. Lacey were aware that Alldredge had

communicated her concerns to the state Board of Nursing and the state Board of Education, and

that awareness could arguably have impacted the employment decision.   In her deposition

testimony, Alldredge acknowledged that, in her phone call to Marbury, she was not only

communicating Champion's incompetency and the policy for orienting new nursing employees,

but she was also asking for specific information about her own responsibility as the nurse

supervising Champion.  She asked "what my responsibility as a supervising nurse would be if I

knew that someone had been hired that did not have the knowledge or skills to safely take care of

the children that were placed within their [sic] care." (Doc. 17-9, at 11). Similarly, Alldredge

spoke to Morgan via telephone about Champion's incompetency and Alldredge's

communications suggesting a plan of action involving orientation.

As is clear from these communications, Alldredge's speech related to the mission of her

employment.   Her employer, the Talladega County Board of Education, was tasked with

ensuring the health and education of students not only at the Mumford schools but also

14

throughout Talladega County.  Thus, Alldredge's speech certainly "addressed an issue relating to the mission of the government employer."  *Garcetti*, 126 S. Ct. at 1960.

Further, her speech not only related to the mission of her employer but also related to the mission of her particular job. As the RN assigned to the Munford schools, she was employed not only to ensure the health of students assigned to her directly in the elementary school, but also to ensure the health of students in the upper grades under the care of the nurse she supervised. Therefore, the health of the children under Champion's care were also the children under Alldredge's ultimate supervision and responsibility; when she was raising concerns on behalf of the health of Mumford middle and high school students, she was doing her job as the RN assigned to all Mumford schools.  Alldredge was fulfilling her official duties of RN assigned to the Munford schools, doing her job, and doing it well.  She did not speak at a public forum or to the public at large but rather she spoke to her supervisors and to people at the Department of Education and the nursing board who could provide guidance as to her school nurse duties and responsibilities.  Because "a public employee who 'make[s] statements pursuant to [her] official duties ... [is] not speaking as [a] citizen[],'" *Garcetti*, 547 U.S. at 421, Alldredge was speaking as an employee, not as a citizen.   In sum, following *Garcetti's* guidance in analyzing alleged government employer retaliation, the court finds that Alldredge's speech has no constitutional protection because she spoke as an employee pursuant to her official duties and her speech related to the mission of her government employer.

Relying heavily on *pre-Garcetti* cases, Alldredge argues that she did not speak as an employee because she was speaking as a citizen about a matter of public concern: the safety and welfare of the students of the Talladega school system, the competency of a member of its

nursing staff, and the Board's method of selection of such a candidate.  At the outset, the court notes that Alldredge's speech did not appear to encompass the Board's method of *selection* of nursing candidates, but rather, was focused on inadequate orientation and supervision.  Even assuming *arguendo* that it did encompass the selection process, the court finds that her alleged speech on that subject would not represent citizen speech on a matter of public concern for the same reasons discussed below.

Alldredge's speech did involve matters that affected the safety and welfare of students, a matter of public concern.  However, as previously discussed, in the governmental employee context, speaking on a matter of public concern is not enough to confer First Amendment protection.  A government employee plaintiff must *also* establish that she was speaking as a citizen, not as an employee pursuant to her duties.

Post-*Garcetti*, the Eleventh Circuit has consistently  denied protected status to government employee speech on matters of public concern where that speech was made pursuant to the employee's job duties.  In *Phillips v. City of Dawsonville*, the Court of Appeals determined that when a city clerk who was also city treasurer spoke to persons associated with city government about a mayor's use of city funds for personal expenses, she spoke pursuant to her official duties and that "the First Amendment does not protect a government employee fulfilling official responsibilities. . . ."  499 F.3d 1239, 1243 (11th Cir. 2007).  In *Boyce v. Andrew*, the Court of Appeals held that case workers investigating reports of alleged child abuse, who complained through emails and other internal channels of the size of their caseloads and the resulting risk to unidentified children in those cases, were speaking as government employees and not as citizens; therefore, their speech was unprotected.  510 F.3d 1333, 1335-6 (11th Cir.

2007).   Similarly, in *Abdur-Rahman v. Walker*, the Court held that compliance inspectors within

a county's public works department did not speak as citizens when they complained to

supervisors about violations of environmental laws related to sewer overflows; it found that

"[s]peech that owes its existence to the official duties of public employees is not citizen speech

even if those duties can be described so narrowly as not to mandate the act of speaking." 567

F.3d 1278, 1285-86 (11th Cir. 2009).   In two of these cases, the Eleventh Circuit emphasized

*Garcetti's* language that the "controlling factor" was whether the speech was performed

"pursuant to job duties."   *Abdur-Rahman*, 567 F.3d at 1282; *Boyce,* 510 F.3d at 1346.

In light of this guidance, Alldredge misses the point when she argues that her speech was

protected because it was not motivated by a private concern for the problems Champion caused

Alldredge but rather, by her public concern about the Board's general practice of failing to

provide a proper orientation for newly hired nurses or substitute nurses.   Even if this problem

was "larger than one nurse," and even if her speech identified a practice in Talladega County

schools that allegedly affected student welfare, as long as Alldredge's speech owed its existence

to her official duties as a Talladega school nurse, it is not citizen speech.   And, if the speech is

not citizen speech, it is not protected no matter how many matters of public concern it raises.

Alldredge also argues that her speech was protected because her letter to Cunningham

"was not something she would have prepared in the ordinary course of her work."  (Pl.'s Br.,

Doc. 19, at 19).  This "not-in-my-job-description" argument is similar to ones that the Eleventh

Circuit has addressed and rejected in at least two post-*Garcetti* cases.  In *Phillips,* the plaintiff

city clerk argued that because reporting on the Mayor's misconduct fell outside the scope of her

official enumerated duties, her speech was citizen speech not employee speech.  However, the

Court of Appeals rejected that argument, explaining that the "Court in *Garcetti* wrote that a public employee's duties are not limited only to those tasks that are specifically designated." 499 F.3d at 1242. Similarly, in *Abdur-Rahman,* the Court rejected the inspectors' arguments that they should get constitutional protection for every report and statement they were *not required* to make even if the speech owed its existence to the performance of their official responsibilities. In those cases, as in this one, the key factor is not whether the employee's communication was something she would *normally* have prepared in the *ordinary* course of her work but whether it owed its existence to job duties. In Alldredge's case, it did. Therefore, it was employee speech and not protected citizen speech.

The lack of protection for public employee speech pursuant to job duties, even when it concerns matters of public interest, emanates from very practical considerations. The Supreme Court's decisions in this area of First Amendment jurisprudence acknowledge that what happens in the offices of public employers is almost invariably of public interest, but public interest "does not alone make it of 'public concern for First Amendment purposes.'" *Boyce,* 510 F.3d at 1344 (quoting *Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir. 1998) (per curiam)). "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark and certainly every criticism directed at a public official would plant the seed of a constitutional case. . . .[The Supreme Court's decisions reflect] the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 & 149 (1983).

In sum, because Alldredge performed her speech as a employee and not as a citizen, her speech is not constitutionally protected, and it cannot form the basis of an action under Section

18

1983.  The court FINDS that the Board's motion for summary judgment is due to be GRANTED as to Count Two, the only federal claim asserted.

## **CONCLUSION**

Having determined that the Board's motion for summary judgment is due to be GRANTED as to the federal claim in Count Two, the court will ENTER JUDGMENT in favor of the Board and against Alldredge on that claim as a matter of law.  As that entry of judgment will resolve the only federal claim, the court, in its discretion, chooses not to exert supplementary jurisdiction over the remaining state claims.  *See Raney v. Allstate Ins. Co.*, 370 F. 3d 1086, 1088-89 (11th Cir. 2004) (stating that the decision whether to exercise supplemental jurisdiction is within the discretion of the district court and noting that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when ... the federal claims have been dismissed prior to trial."). Thus, the court DOES NOT REACH the motion as to the state claims in Counts One and Three, and will dismiss those claims without prejudice.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 20th of October, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE